In re the marriage of:

Herbert Raymond Glidewell,
Petitioner-Respondent,

v.

Jill Irene Glidewell, Now known as
Jill Irene Riley, Respondent-Appellant.†

Court of Appeals

*No. 2014AP1957. Submitted on briefs April 14, 2015.
—Decided July 7, 2015.*

2015 WI App 64

(Also reported in 869 N.W.2d 796.)

† Petition for Review denied.

589

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Christopher Hueneke* of *Magner, Hueneke, Smith & Borda, LLP*, of Greenfield.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Barry J. Book* of *Podell & Book, S.C.*, of Milwaukee.

Before Curley, P.J., Brennan, J., and Thomas Cane, Reserve Judge.

¶ 1. BRENNAN, J. Jill Irene Glidewell (n/k/a Jill Irene Riley) appeals from a post-judgment custody order continuing joint custody with Jill's former husband Herbert Glidewell, but allocating certain decision-making to each party. After stipulating to joint custody in the original divorce, Jill sought to reopen the divorce judgment and modify custody on the basis of a domestic violence incident that occurred *prior* to the original divorce, arguing that the circuit court erred in not applying the domestic violence presumption—set forth in Wis. Stat. § 767.41(2)(d) (2013–14)[1]—that it is "contrary to the best interest of the child to award joint or sole legal custody to" a parent who "the court finds by a preponderance of the evidence . . . has engaged in a pattern or serious incident of interspousal battery . . . or domestic abuse."[2]

¶ 2. The circuit court denied Jill's motion to reopen the judgment, concluding that Jill had waived the domestic violence statutory presumption by stipulating to the original joint custody order. But the court did grant a modification of the custody order, keeping joint custody, but allocating school decisions to Herbert and health care decisions to Jill.

¶ 3. Jill argues that the circuit court erred in concluding that she had "permanently"[3] waived the

---

[1] All references to the Wisconsin Statutes are to the 2013–14 statutes unless otherwise indicated.

[2] Jill brought other motions and petitions for injunctions that are not relevant to this appeal.

[3] In her brief to this court, Jill states that the circuit court ruled that she "permanently" waived her right to request the domestic violence presumption pursuant to Wis. Stat. § 767.41(2)(d) when she stipulated to joint custody. However, the circuit court never used the word "permanently"; Jill's use of the word "permanently" is merely her characterization of the court's order.

domestic violence presumption when she stipulated to joint custody in the original divorce. She additionally contends that the great weight and clear preponderance of the evidence does not support the circuit court's post-judgment modified joint custody order.

¶ 4. We agree with the circuit court and affirm. Jill waived her right to raise the domestic violence presumption set forth in Wis. Stat. § 767.41(2)(d) in this post-judgment motion because the domestic violence she relies on occurred *prior* to her original divorce judgment, at which time she stipulated to joint custody. Jill cannot now assert the domestic violence presumption based on the *pre*-divorce incident and without asserting any post-judgment domestic violence facts.

¶ 5. We also conclude that the circuit court properly exercised its discretion when it ruled that it was in the children's best interests to continue joint custody and divide up final decision-making authority for educational and medical decisions between the parents. As the circuit court noted in a thorough and well-reasoned decision, both Jill and Herbert have been unable to put their anger for each other aside in order to do what is best for their children.

## BACKGROUND

¶ 6. Jill and Herbert Glidewell were married on September 22, 2007. Their daughter was born on March 13, 2008. Less than a year later, on December 3, 2008, Herbert filed for divorce. The parties' son was born shortly thereafter on June 20, 2009.

¶ 7. On May 1, 2009, while the divorce action was pending, but prior to the birth of their son, Jill filed a petition for a domestic abuse injunction against Her-

bert. On May 15, 2009, the family court commissioner granted the petition, and it was later affirmed by the circuit court.[4] The petition expired on May 15, 2013.

¶ 8. On May 3, 2011, two years after the domestic abuse injunction was granted and while it was still pending, Jill and Herbert stipulated to the custody and placement of their minor children. The stipulated placement schedule awarded placement to Jill at sixty-four percent of the time and to Herbert at thirty-six percent of the time, in addition to establishing various other conditions of placement. During a May 3, 2011 court hearing, Jill testified as follows when questioned by her attorney about the custody agreement:

Q Do you believe that the terms and provisions in that document are in the children's best interest?

A Yes. I believe I have had to concede quite a bit, but yes.

Q So is it your statement and testimony that under the circumstances this is in the children's best interest?

A Yes.

Q And we did have three days of trial, and the two big issues that have been at the forefront are custody and placement; is that right?

A Yes.

Q But knowing all of that, you will agree to signing this custody document as it is before you?

A Yes.

---

[4] The Honorable Francis T. Wasielewski affirmed the court commissioner's decision granting the petition.

. . . .

Q . . . So you have had an ample opportunity to think about this and agree to the resolution on the issue of custody?

A Yes.

¶ 9. At the conclusion of the hearing, the circuit court adopted the parties' stipulation, which carried the recommendation of the guardian ad litem, and incorporated the stipulation into the final judgment of divorce. Before doing so, the circuit court acknowledged the existence of the domestic abuse injunction and the highly acrimonious relationship that existed between Jill and Herbert.[5]

¶ 10. Immediately following the circuit court's grant of the petition for divorce, Jill began filing numerous motions regarding custody and placement, including, as relevant here, a December 14, 2012 motion requesting modification of the divorce judgment to give her sole placement and custody, and a June 10, 2013 motion to reopen the judgment pursuant to WIS. STAT. § 806.07(1)(a), (b), (d), and (h).[6] Jill argued that the circuit court, when entering the divorce judgment:

---

[5] Judge Wasielewski presided over the May 3, 2011 hearing and granted the petition for divorce on the record; Judge Wasielewski's successor, the Honorable Frederick C. Rosa, signed the written divorce judgment and presided over post-judgment proceedings.

[6] The circuit court summarized the parties' various post-judgment motions thusly:

> Immediately after the parties entered an agreement in this case, problems arose. We've had a series of motions. We've had fights over school, over medical treatment, where are people living, injuries to the children. It's just been one thing after

"inadvertently" failed to engage in any meaningful discussion of the relevant factors set forth in Wis. Stat. § 767.41(2)(d) in order to rebut the presumption that it was detrimental to the children and contrary to the best interests of the children to award joint or sole legal custody to a party who has, by a preponderance of the evidence, engaged in a serious incident of domestic violence.

¶ 11. After hearing the evidence in a post-judgment hearing held on February 26, 2014, the circuit court ruled that the parties shall continue joint legal custody but that Jill would have final decision-making authority in the event of a dispute regarding medical care for the children and that Herbert would have final decision-making authority in the event of a dispute regarding educational decisions for the children.[7] The circuit court concluded that Jill waived

another in this case. And part of the problem is these parties have a very long, tortured history, so to speak. And they do not get along. That's very clear.

[7] Jill filed her motion to revise custody and placement without specifying the applicable statute. Custody modifications are permitted under Wis. Stat. § 767.451(1). Pursuant to § 767.451(1)(a), modifications made within two years of final judgment are subject to a higher burden, that is, a court must find physical or emotional harm to the child, as well as find what is in the best interest of the child. Pursuant to § 767.451(1)(b), modifications made after two years from the final judgment are subject to a lower burden, that is, the court need only find a substantial change of circumstances and determine that modification is in the best interest of the child. Jill filed her motion on December 14, 2012, *less* than two years from the judgment of divorce. The circuit court did not enter the modification order until February 26, 2014, more than two years from the judgment. The circuit court stated, without discussion by the parties or court, that it was applying the burden on modification set forth in § 767.451(1)(b). *See id.*

application of the domestic violence presumption set forth in Wis. Stat. § 767.41(2)(d) when she stipulated to joint custody after the domestic abuse injunction had been issued. More specifically, the circuit court found as follows:

> Now, the way I read [§ 767.41(2)(d)], there is a presumption. There's no dispute in this case that the judge did find that there was domestic abuse, but this — this statute seems to contemplate a party asserting the presumption on their behalf. And then if the judge is going to make a finding contrary to the presumption, he has to find these things that the legislature requires. That's probably a long way of saying that I believe that notwithstanding this statute, a party can

(permitting modification if it is in the best interest of the child and there has been a substantial change in circumstances since entry of the last order). No party objected to the application of that standard at the hearing. Jill does not appeal the application of that lower standard and neither party raised this as an issue in their appellate briefs. Ordinarily, we do not decide issues not appealed and addressed by the parties. *Waushara Cnty. v. Graf*, 166 Wis. 2d 442, 451, 480 N.W.2d 16 (1992).

We note that the guardian ad litem's report to the circuit court asserted that the circuit court had the authority to apply the lower burden where the modification decision was not made until after two years from the judgment, relying on our decision in *Paul M.J. v. Dorene A.G.*, 181 Wis. 2d 304, 313, 510 N.W.2d 775 (Ct. App. 1993). However, *Paul M.J.* is not completely on point, although it does authorize the application of the lower standard to modification orders made after two years, despite the earlier filing. In *Paul M.J.*, we concluded that "where the petitioner has made proper allegations for a modification under sec. 767.325(1)(a), [the predecessor statute to Wis. Stat. § 767.451] the court has the discretion to conduct a hearing and issue an order effective after the expiration of the statutorily imposed 'truce' during the two-year period under appropriate and limited circumstances." *Paul M.J.*, 181 Wis. 2d at 313. We also note that the plain language of § 767.451(1) and (2) applies to the timing of "modifications," not filings.

come in and they can waive the requirements of this statute by going on the record and stipulating with the judge that they would like to have joint custody even though domestic abuse exists.

There is nothing in the statute which indicates that these findings can't be waived. That's No. 1. No. 2, when I look at domestic abuse cases and what we do in this particular state, my feeling is that courts give lots of deference to the wishes of the victims.

. . . .

In this particular case, the history was known. I don't know what specific discussion was had with [Jill], but there is nothing in the record that indicates to me that she advised the judge that, "I want to assert this presumption, and I want sole custody." She did the exact opposite.

Jill appeals.

## DISCUSSION

¶ 12. Jill raises two issues on appeal. First, she argues that the circuit court erred in concluding that she waived her right to raise the domestic violence presumption set forth in WIS. STAT. § 767.41(2)(d) when she stipulated to joint placement and custody. Second, she contends that the great weight and preponderance of the evidence do not support the circuit court's joint custody award. We address each in turn.

**I. Jill waived her right to assert the WIS. STAT. § 767.41(2)(d) domestic violence presumption based upon the facts in existence at the time she stipulated to joint custody.**

█

¶ 13. Jill first argues that the circuit court erred as a matter of law when it found that she waived

application of the Wɪs. Sᴛᴀᴛ. § 767.41(2)(d) domestic violence presumption to her post-judgment motions because she stipulated to joint custody in her original divorce judgment. Jill argues that she is entitled to a reopening of the custody order under Wɪs. Sᴛᴀᴛ. § 806.07 and modification to sole custody under Wɪs. Sᴛᴀᴛ. § 767.451(2), based on an analysis of the domestic violence presumption. That argument requires us to review the circuit court's interpretation of § 767.41(2)(d). Questions of statutory interpretation are questions of law that we review *de novo. See Zellner v. Cedarburg Sch. Dist.*, 2007 WI 53, ¶ 16, 300 Wis. 2d 290, 731 N.W.2d 240.

¶ 14. The purpose of statutory interpretation is to give full effect to the policy choices of the legislature. *See State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. To that end, we start by examining the language of the statute to ascertain its plain meaning. *See id.*, ¶¶ 44–45. We give words and phrases their "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.*, ¶ 45. "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46. We read statutes in a manner that gives reasonable effect to every word, in order to avoid surplusage. *Id.* " 'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.' " *Id.* (citation omitted). A statute is ambiguous only if rea-

sonably well-informed persons could interpret its meaning in two or more senses. *Id.*, ¶ 47.

¶ 15. WISCONSIN STAT. § 767.41(2)[8] sets forth factors the court may consider in determining the best interest of the children for a joint or sole custody award. One of those factors, § 767.41(2)(d), states, in relevant part:

> ... if the court finds by a preponderance of the evidence that a party has engaged in a pattern or serious incident of interspousal battery . . .or domestic abuse . . ., there is a rebuttable presumption that it is detrimental to the child and contrary to the best interest of the child to award joint or sole legal custody to that party. . . .

*Id.*

¶ 16. The plain language of the statute permits, but does not mandate, an analysis of whether a party has engaged in a pattern or serious incident of domestic abuse. We assume the legislature intentionally chooses its words. *Kalal*, 271 Wis. 2d 633, ¶ 39 (We "must presume that a legislature says in a statute what it means and means in a statute what it says.") (citations and quotation marks omitted). Here, the legislature chose to require the parties and guardian ad litem to ask the court to consider whether there was a pattern or serious incident of domestic abuse, and Jill chose not to do so at the time of the original divorce.

---

[8] WISCONSIN STAT. § 767.41(2) states, as relevant:

CUSTODY TO PARTY; JOINT OR SOLE. (a) Subject to pars. (am) to (e), based on the best interest of the child and after considering the factors under sub. (5) (am), subject to (5) (bm), the court may give joint legal custody or sole legal custody of a minor child.

¶ 17. Additionally, estoppel principles apply. It is an often-stated principle of law that "[i]t is contrary to fundamental principles of justice and orderly procedure to permit a party to assume a certain position in the course of litigation which may be advantageous, and then after the court maintains that position, argue . . . that the action was error." *State v. Gove,* 148 Wis. 2d 936, 944, 437 N.W.2d 218 (1989). It is undisputed that Jill agreed to joint legal custody and did not raise the Wis. Stat. § 767.41(2)(d) domestic violence presumption at the time of the divorce. She testified she believed joint custody to be in the best interests of her children and asked the court to award it. Now, she raises application of § 767.41(2)(d) here for the first time more than two years after the divorce was granted during the course of post-judgment proceedings. She is doing precisely what *Gove* prohibits, reversing her position and claiming error. Consequently, fairness and principles of judicial administration support the court's conclusion that she waived application of the presumption.

¶ 18. Permitting waiver of the Wis. Stat. § 767.41(2)(d) domestic violence presumption in this instance also stays true to the purpose of the statute, which is to ensure the best interests of the children. *See* § 767.41(2)(a) ("based on the best interest of the child . . . the court may give joint legal custody or sole legal custody of a minor child"). Jill testified at the May 3, 2011 hearing that the joint custody agreement was in the children's best interest, and the agreement was endorsed by the guardian ad litem. The circuit court, after careful consideration, and after acknowledging the acrimonious relationship between Jill and Herbert, including their history of domestic violence, also found the joint custody agreement to be in the children's best interest.

¶ 19. In short, Jill waived her right to seek application of WIS. STAT. § 767.41(2)(d) based upon the domestic abuse injunction and the events occurring prior to entry of the divorce judgment.[9] Jill had an opportunity to raise the presumption at the May 3, 2011 hearing. She did not do so. To the contrary, she testified that she was stipulating to joint custody and that she believed joint custody was in the children's best interest. She " 'cannot be heard to complain of an act to which [s]he deliberately consent[ed]." ' *See Nehls v. Nehls*, 2012 WI App 85, ¶ 14, 343 Wis. 2d 499, 819 N.W.2d 335 (citation omitted).

¶ 20. We note, however, that Jill's decision to stipulate to joint custody at the time of the divorce does not mean that she is barred from ever again seeking application of WIS. STAT. § 767.41(2)(d); rather, she has waived her right to seek application of the presumption based upon the *facts that existed at the time* she

---

[9] As noted in *State v. Ndina*, 2009 WI 21, 315 Wis. 2d 653, 761 N.W.2d 612, courts often use the terms "waiver" and "forfeiture" interchangeably, although they are two different concepts. *Id.*, ¶ 29. ("Although cases sometimes use the words 'forfeiture' and 'waiver' interchangeably, the two words embody very different legal concepts. 'Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.' ") (citation omitted). Jill does not develop any argument under *Ndina*, that is, she does not argue that she knew of her right to assert the domestic violence presumption and intentionally chose not to raise it nor does she argue that she was unaware of the statute and did not know to raise it. Rather, she argues that the circuit court had an obligation to analyze custody in light of the domestic violence injunction, implying that the court should have brought it up even if she did not. Because we conclude the court did not have such an obligation, we will not develop an argument as to the application of the term waiver or forfeiture to her decision not to assert the domestic violence presumption.

stipulated to joint custody. Jill is free to seek application of the presumption in the future if she has new facts, occurring since she stipulated to joint custody, that support the presumption. However, she has not set forth such new evidence here. She currently alleges only that "[i]t is clear by the record" that Herbert has engaged in "passive-aggressive and controlling rather than physically violent" behaviors since the entry of the divorce judgment. She does not go on to explain how Herbert's "passive-aggressive" behaviors demonstrate that he "engaged in a pattern or serious incident of interspousal battery . . . or domestic abuse." *See id.* As such, the circuit court properly found that Jill waived her right to raise the domestic violence presumption to the extent that she relies on events that occurred prior to her stipulation to joint custody.[10]

## II. The circuit court's joint custody order is supported by the great weight and clear preponderance of the evidence.

¶ 21. In the alternative, Jill contends that the record does not support the circuit court's finding that joint legal custody and specific decision-making responsibilities are in the children's best interests. For the reasons that follow, we disagree.

---

[10] We note that Jill does not appeal the circuit court's *discretionary* decision to deny the reopening of the judgment pursuant to Wis. Stat. § 806.07. She only argues that the court made the wrong legal decision when it concluded that she waived the domestic violence presumption under Wis. Stat. § 767.41(2)(d). She does not argue that there is any other evidence in the record, other than the pre-divorce domestic violence, that would support her motion to reopen the judgment.

¶ 22. We review modification of a placement order to determine if the decision reflects a reasonable exercise of discretion. *See Goberville v. Goberville*, 2005 WI App 58, ¶¶ 6, 18, 280 Wis. 2d 405, 694 N.W.2d 503. "We will sustain discretionary acts as long as the [circuit] court examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion a reasonable judge could reach." *Id.*, ¶ 7. "Discretionary decisions must be arrived at by application of the proper legal standards; the failure to apply the correct legal standards is an erroneous exercise of discretion." *LeMere v. LeMere*, 2003 WI 67, ¶ 14, 262 Wis. 2d 426, 663 N.W.2d 789.[11]

¶ 23. WISCONSIN STAT. § 767.451(1)(b) creates a two-step process for a court to follow in determining whether to modify the terms of physical placement two years after a final judgment determining custody or physical placement. As a threshold matter, the moving party must show "[t]here has been a substantial change of circumstances since the entry of the last order . . . substantially affecting physical placement." § 767.451(1)(b)1.b. If that showing is made, the court proceeds to consider whether any modification would be in the best interests of the child. § 767.451(1)(b)1.a. In determining the best interests of the child, the court must consider the factors set forth in WIS. STAT. § 767.41(5)(am), which include, as relevant here:

> 1. The wishes of the child's parent or parents, as shown by any stipulation between the parties . . . .

---

[11] We note again that we assume without deciding that the circuit court applied the correct legal standard to modification under WIS. STAT. § 767.451(2) for the reasons we stated in footnote 7.

2. The wishes of the child, which may be communicated by the child or through the child's guardian ad litem . . . .

3. The interaction and interrelationship of the child with his or her parent or parents, siblings, and any other person who may significantly affect the child's best interest.

4. The amount and quality of time that each parent has spent with the child in the past . . .

5. The child's adjustment to the home, school, religion and community.

6. The age of the child and the child's developmental and educational needs at different ages.

7. Whether the mental or physical health of a party . . . negatively affects the child's intellectual, physical, or emotional well-being.

8. The need for regularly occurring and meaningful periods of physical placement to provide predictability and stability for the child.

9. The availability of public or private child care services.

10. The cooperation and communication between the parties and whether either party unreasonably refuses to cooperate or communicate with the other party.

11. Whether each party can support the other party's relationship with the child, including encouraging and facilitating frequent and continuing contact with the child, or whether one party is likely to unreasonably interfere with the child's continuing relationship with the other party.

12. Whether there is evidence that a party engaged in abuse . . . of the child . . .

605

. . . .

13. Whether there is evidence of interspousal battery . . . or domestic abuse . . . .

14. Whether either party has or had a significant problem with alcohol or drug abuse.

15. The reports of appropriate professionals if admitted into evidence.

16. Such other factors as the court may in each individual case determine to be relevant.

■

¶ 24. Here, there is no doubt that the circuit court considered the relevant factors set forth in WIS. STAT. § 767.41(5)(am) before concluding, in a thoughtful and well-reasoned decision, that joint custody was in the children's best interest.

¶ 25. The circuit court began by aptly noting that the parties seem to have "themes about the case." Jill believes that this case is about domestic violence and Herbert's use of "fear, power, and control." Herbert contends that Jill is "overly litigious" and that "she doesn't respect [Herbert's] rights as a father." According to the circuit court, "[t]he guardian ad litem view[ed] this case as a series of unilateral decisions concerning the children that were made by [Jill] . . . [and] that, intentionally or not, [Jill's] actions have had the practical effect of limiting [Herbert's] access to the children."

¶ 26. The circuit court noted that at the end of the testimony, the court "asked both of these parties whether anybody was willing to make any compromises to try and resolve their dispute, and both sides essentially said no." The court then went on to document in detail the bad behavior both Jill and Herbert had been exhibiting:

This is a case where there are issues with both parents, in my opinion. And, you know, I may have to say some things about both of you that are not flattering, but those are just my observations having sat and listened to both of you patiently, I think, and all of the witnesses you asked me to listen to.

Both of you I think are very determined to win. That's just my feeling. And your desire to win, I think, is harming your children or it makes it difficult for you to put your kids first. The teacher came in and said, I don't know, she found dad's body language or the way he dealt with her is — she felt intimidated. She also felt intimidated by mother, who she felt was trying to influence statements that she would make to internal affairs. I'm sure [Herbert] and [Jill] didn't intend to intimidate the teacher, but that's what she said about you two.

The representatives from the early autism program were intimidated. [Jill] was very insistent about attending meetings and even if that meant excluding [Herbert]. In fact, the way she insisted that the children participate in the program, [Herbert] would not be allowed to participate in anything. And when the program tried to get her to understand [that it was] very important for the treatment of the child[ren] that both parents participate, she threatened to report them if she was not allowed to be at every meeting or if there were any meetings with the children at dad's house or any meetings that she was excluded from. And that person took that as a threat to sue them, and they put the children out of the program. Now, [Herbert] wasn't consulted when the children were put in that program, and he was upset, and he threatened not to pay, and that was not helpful either.

¶ 27. The circuit court then discussed Herbert's behavior. The circuit court acknowledged the parties' history of domestic violence and stated that it did not

607

"know if . . . [Herbert] fully understands the impact of whatever went on with [Jill]. I don't know if he understands the impact on her and how that's feeding into this whole situation here. It is a factor." However, the court ultimately found that it did "not believe[,] having listened to the child abuse injunctions and all of this testimony[,] that this gentleman is a danger to the child — or to the children. He may have some lapses in supervision, but the kids are safe in his hands."

¶ 28.　The circuit court noted that Herbert has a history of poorly supervising the children, leading to injuries that caused Jill to file two separate child abuse injunctions.[12] The circuit court noted that Herbert tends to "minimize[]" the children's injuries, although the court stated, "I don't know if that's because dad doesn't get it or I — or because he's afraid of [Jill] and what the response is going to be if he tells her. I really — it's probably a little bit of both."

¶ 29.　The circuit court also commented on Herbert's role in the parents' inability to communicate or cooperate, stating that Herbert "believes, you know, as between him and mother if they have a dispute about school or something else, his opinion to him is more persuasive than hers. I don't even know that he's capable of considering her opinion." The court also found it troubling that Herbert seemed unable to set

---

[12] Post-judgment, Jill filed two separate petitions requesting injunctions against Herbert on behalf of the children. Both injunctions were based on serious injuries sustained by the parties' daughter while she was staying with Herbert; Herbert did not inform Jill of these injuries in contradiction of their settlement agreement. Jill eventually agreed to dismiss her requests for injunctive relief on the condition that the dog that allegedly caused the injuries be removed from Herbert's home.

608

aside his feelings towards Jill in order to do what is best for the children, stating:

> He is so distrustful of mother at this time I think it has some impact on his ability to consider matters concerning the children and what's in their best interests, and sometimes it gets in the way of the thought process. Like, for example, the thing with the autism people. Child's autistic; everybody agrees that the services are needed. But he's so upset that mother didn't tell him or put his name on the contact list that he didn't want to pay. You know, I could understand him being upset, but that child would have benefited from those services. And, you know, sometimes somebody has to step up and be bigger than the other party. There is — he has little appetite in terms of being able to compromise with mother. They just can't do it.

¶ 30. Despite all of those negatives, the circuit court praised Herbert for acknowledging throughout the trial that Jill was a good mother and that she needs to be in their children's lives. The court believed "that was an important concession given how he feels about her personally. I think deep down he would probably be inclined to move towards a solution that doesn't involve so much conflict, maybe take a more peaceful approach." The court also found that Herbert "is a good father, the kids running up to him at school. He loves the kids; they love him. He wants to spend time with his kids. He's willing to fight for that. [Herbert] wants [Jill] to recognize his value to the kids as a father, and that's a real significant issue in this case."

¶ 31. Next, the circuit court considered Jill's behavior. The court noted that Jill was a victim of domestic violence and acknowledged that domestic violence "affects people in different ways." The court affirmatively stated that it believed "victims should be

protected" and that it tries "to be vigilant about power and control issues." However, the court noted that regardless of Herbert and Jill's messy history "it's really affecting some of the decision-making here in a way that's not good for the kids."

¶ 32. The circuit court found that Jill sometimes "overreact[ed]" to Herbert's "missteps" and noted that "she resorts to litigation frequently." The court also observed that "during her testimony on the stand and in reading through some of the deposition excerpts," Jill wanted "to put herself in a positive light." The court stated that the desire meant that Jill sometimes failed to respond to questions presented to her on the stand or gave deceptive answers.

¶ 33. The circuit court found that Jill was intimidating, detailing concerning behavior that it observed from Jill in the courtroom and found documented in the record:

> I could feel as a judge the intensity on both sides when they took the witness stand and how they responded to questions. I was really taken aback when I reviewed the transcript and there was a portion in one proceeding where Judge Wasielewski stopped the proceeding and he, addressing [Jill's] counsel, said to counsel that he was very uncomfortable at the way that [Jill] was staring at him during the proceedings and that he thought she was trying to intimidate him and he didn't like it.

¶ 34. The circuit court found that Jill was also "not prone to compromise," and that she continued to make "unilateral decisions," "picking schools, for example, the Birth to Three program with WEAP where dad was not included in the discussions, not — his contact information was not provided. In fact, you would have thought the child didn't have a father if

you read the application that was filled out. I don't think that was a good way to do things, irrespective of whatever went on between these people."

¶ 35. The circuit court expressed extreme concern over how it believed Jill would handle sole custody if he granted her request: "I think if I gave [Jill] sole custody, she would probably actively work to diminish [Herbert's] role as a father in the children's lives and would probably take actions that might limit his access. To some extent, the kids would be used to exact punishment on [Herbert] for whatever he may have done to her over the years."

¶ 36. However, the circuit court also acknowledged that Jill is "a very good mother. . . . She loves her kids. I think she wants the best for them. She has exhibited some decision-making concerning the kids which shows that she can put their interests high up on the list. She's certainly a capable parent. I think in terms of the kid[']s needs, she's probably more attentive than dad. I didn't see so many of the accidents and bumps and bruises and other things."

¶ 37. The circuit court then noted that it read all of the briefs submitted to the court, including the brief submitted by the guardian ad litem. In his brief, the guardian ad litem expressly stated that he believed that there had been a substantial change in circumstances in this case based upon Jill's decision to move "from the southwest corner of the City of Milwaukee, which was a manageable distance from the father's residence, to Oconomowoc, Wisconsin and unilaterally selected and enrolled the parties' children in an Oconomowoc public school." The brief then thoughtfully and thoroughly considered each of the Wɪs. Stat. § 767.41(5)(am) factors and their relevance to the case.

611

¶ 38. The circuit court stated that it agreed with the "[guardian ad litem's] brief and his analysis of all of the [Wis. Stat. § ]767.41(5) factors," and the court adopted all of those findings. The court then concluded that it was "important [to] maximize the placement that each parent has with the children," but acknowledged that "[t]he parties are not going to work together." Consequently, the circuit court found as follows:

> Okay. Consistent with the recommendations of [the guardian ad litem], I'm going to continue joint custody; but as to medical decisions concerning the children, the final decisions are to be made by mother. That doesn't mean don't talk, don't communicate. It means talk, communicate; and if you can't agree, mother's going to make the final decisions.
>
> As to educational decisions, I'm going to make the father — give him the final decision-making authority after the parties have conferred.
>
> I don't do this lightly. The big fight here is where the kids go to school, and where they go to school drives a whole lot more of this case. Now, these parties live, I don't know, 50 minutes apart, 40, 50 minutes on the freeway probably on a good day, worse during the rush hour. I don't want to penalize [Jill] because she needs to get away to feel better about things, but I am concerned about kids that have to sit in the car for hours at a time because they are being harmed by this process.

¶ 39. The circuit court did not erroneously exercise its discretion. The circuit court's decision was based upon the proper law and included a thoughtful consideration of the relevant Wis. Stat. § 767.41(5)(am) factors. Jill's objections amount to little more than an assertion that she believes the circuit court should

have weighed those factors differently. But our standard of review does not permit reversal of the circuit court's order on those grounds.

¶ 40. The circuit court found that both Jill and Herbert had significant bonds with each of their children and that it would be harmful to the children if either of those bonds were broken. The circuit court further acknowledged that the anger that Jill and Herbert have towards one another clouds their judgment and prevents them from making important collective decisions on behalf of their children. As such, the court decided to divide up decision-making duties between the two. That conclusion is rational based upon the parties' actions in this case.

¶ 41. Jill's primary argument is that since the circuit court entered the order assigning final decision-making authority for educational decision to Herbert, that Herbert has chosen a school one block from his house. Jill argues that this decision circumvents the circuit court's "statements that the goal in fashioning [its] order was to eliminate the travel time for the children to and from school and attempt to ensure that neither party had an advantage with respect to matters involving the children." Jill also asserts that Herbert's decision to enroll the children in a school one block from his home is an attempt to "exert control about where his former victim [Jill] will reside, when the intention of the court was not to 'punish' the mother for needing to get away."

¶ 42. We recognize Jill's frustration with Herbert's decision to enroll the children in a school a block from his home, which greatly increases their daily travel time and is very inconvenient for Jill; we share in that frustration. However, the circuit court's primary goal in fashioning the joint custody agreement

613

was not to reduce travel time, but to ensure that both parents remained active in the children's lives and to attempt to end the gridlock and fighting that ensues when Jill and Herbert attempt to make important decisions surrounding their children's educational and medical issues. While the circuit court did urge Herbert to work with Jill, and to consider the children's travel time when selecting a school, it also recognized that it was a distinct possibility that Herbert would not be able to communicate with Jill and would view travel time differently than the court. The circuit court expressly found that each parent has a right to see the children, but that neither can set aside his or her anger in order to make important decisions on behalf of the children. That is why the court chose to divide up important decision making between the parents to the extent they cannot agree. Jill and Herbert have collectively made decisions to hurt each other at the expense of their children, and now they must live with the consequences of those actions. The circuit court's decision is rational and based upon the law and facts of this case. As such, we affirm.

*By the Court.*—Order affirmed.