860 A.2d 408

**Michael Keith SHENK**

v.

Julie O. SHENK.

No. 2349, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Oct. 28, 2004.

Daniel L. Owel, Rockville, for Appellant.

James G. Nolan, (Furey, Doolan & Abell, L.L.P., on the brief), Chevy Chase, for Appellee.

Panel: MURPHY, C.J., BARBERA, THIEME, RAYMOND G., Jr. (Ret'd, Specially Assigned), JJ.

THIEME, J.

This is an appeal of the custody and child support provisions of a Judgment of Absolute Divorce entered by the Circuit Court for Montgomery County. Appellant Michael Keith Shenk ("husband") presents two issues arising from the court's decisions as to custody of the parties' three children and child support. Our review will focus on the facts neces-

sary for consideration of the following issues of the appellant, which we have restated:

I.  Did the trial court err in attributing to the wife hypothetical monthly child care expenses?

II. Did the trial court err in awarding the parties joint legal custody with the wife having final tie-breaking decision-making authority in the event of a future dispute?

## FACTS

The parties were married on November 16, 1996, and had three children before separating voluntarily on May 25, 2002. The husband, a high school graduate, testified that he had worked for an internet telecommunications company, earning $90,000.00 a year, until he was fired in June of 2001. Because he had long hungered to own a restaurant, the husband began working variable hours as a server at a Houston's restaurant to learn the business. In 2002, he earned $29,452.15. He told the court that he was not actively seeking new employment because working at Houston's gave him the flexibility to deal with the circumstances of his personal life caused by the divorce. However, he realized that he had to start looking for a better paying job and he was trying to "network" through family, friends, or customers at the restaurant.

Reverting for the moment to the point in time when the husband lost his telecommunications job, the appellee wife, who has a bachelor degree in business administration, began working fifteen to eighteen hours per week doing record keeping and running errands for her father's real estate business. She earned $1,500.00 per month. She and the children continued to reside in the family home and her working hours were arranged around the children's schedules. Her mother, who lived next door, watched the children one day per week and the two women shared a housekeeper/babysitter. The wife paid this housekeeper/babysitter $1,290.00 per month, $400.00 of which was reimbursed by her mother for one day per week of housecleaning. The wife estimated

that her child care and housecleaning expenses would increase to $1,421.00 per month if she went to work full time.

The husband testified that his sister, a day care provider who lived approximately 20 minutes from the family home, had offered to watch the parties' children at no cost.

The parties and other witnesses testified about their relationship prior to and during the separation period. The husband's cousin and wife's friend told the court that both parties were good with their children, but that, "[w]ith each other, there was turmoil." However, she felt their communication had improved since they had developed a system of writing to each other in a notebook. The husband concurred with that assessment, telling the court that he thought his wife was a good parent, who made good decisions, but that he wanted the opportunity to be involved in making those decisions. The court asked if a disagreement related to a minor decision, such as participation in sports, might end up in litigation, and the husband replied, "What I would say is go ahead and sign [the child] up for that." He stated that he would make efforts to remain an active parent.

The wife also testified that the notebook had helped to defuse tensions between them. She complained that her husband was inconsistent in his opinions about the children. She said that she felt she knew what was best for them. While she wanted his input, she felt that, "if I need to make that call, I think I'm the one to do it."

## DISCUSSION

### I.

-the child support issue-

■ At the conclusion of trial, the court found that both parents were voluntarily impoverished. The court then imputed $65,000.00 of income to the husband. Based on the testimony of the wife's father, the court found that she could earn at least $45,000.00 by working full time. "After the court makes a finding of voluntary impoverishment, the court must

then make a determination of 'potential income' to impute to the parent who has become voluntarily impoverished, in order to ascertain the appropriate level of child support," *Malin v. Mininberg,* 153 Md.App. 358, 406, 837 A.2d 178 (2003). Regarding child care, the court stated:

> Maybe she needs a day care provider. Maybe she doesn't. I have to, I think if I am going to find that she is voluntarily impoverishing herself because she is not working full-time, I have to assume that she is going to have to pay somebody to watch the children while she does that.

> The testimony of Mr. Shenk was that the amount of money that was paid to the day care provider in this case was reasonable for somebody who watched a 2–year–old all day and who would have the responsibility for watching a 3–year–old, and would have the responsibility for watching the 5–year–old when he comes back from his school.

When questioned by husband's counsel as to whether it would make a difference whether the wife was employed part time or full time, the court answered that it did not. Counsel pursued this point, asking what the amount of child support would be if the wife did not work full time, continuing to earn the same income, and the following transpired:

> THE COURT: The appropriate child support is what I have ordered. All right? Because I don't believe that I can attribute income to her and at the same time not attribute some day care expenses. Do you follow me?

> [DEFENSE COUNSEL]: I follow you, Your Honor. I am just, I guess my concern is Ms. Shenk doesn't go out to get a job, survives on her present income.

> Then we have the issue of whether or not the day care is job-related and then he is paying a number that is a lot higher if we did a calculation on her present income. This is the concern I had—

> THE COURT: I understand your concern. We will just have to wait and see what happens come September 1, 2003, because that's what I have ordered now.

I think that we need to have some incentive for both of these parties to get to work. If in fact she is not working, you may have to revisit the issue.

[DEFENSE COUNSEL]: I understand. I am not arguing, Your Honor. I am just saying there is an incentive to Mr. Shenk because you have ordered that in a couple of months there is going to be a child support number that is considerably bigger to him.

I do not know what incentive in anything the Court has said is there for Ms. Shenk to go out and get a job. You haven't changed anything.

It is just going to be a higher number, based on his income. There is no incentive for her to do anything here.

That's my concern.

THE COURT: I understand.

[DEFENSE COUNSEL]: All right.

THE COURT: That's my order. I can understand your concern. I would have the same concern. I thought about that concern, but that's the only way that I can see to do it right now.

In its written ruling, the court ordered the husband to pay $900.00 per month until September and $2,043.00 per month thereafter. On September 8, 2003, the husband filed a post-trial motion to amend that provision, based upon the wife's continued part-time status. The motion was denied, although the trial court stated that this fact "would be a sufficient basis for the filing of a Motion to Modify Child Support. . . ."

■ On appeal, the husband argues that the trial court erred by awarding the wife an amount of child support that was based upon hypothetical work-related expenses. We agree.

■ The statutory basis for calculating child support is the parties' adjusted actual incomes. Md.Code (1999 Repl.Vol., 2003 Supp.), Family Law Article ("FL"), § 12–204. In addition, section 12–204(g)(1) provides "actual child care expenses incurred on behalf of a child due to employment or job search

of either parent shall be added to the basic obligation and shall be divided between the parents in proportion to their incomes." This section provides a mechanism whereby the court may, under appropriate circumstances, award actual child care expenses. The burden of proof as to the existence of the prerequisites to entitlement is upon the spouse who seeks actual child care expenses.

█ Child support orders ordinarily are within the sound discretion of the trial court. However, when an order involves an interpretation of statutory and case law, as it does in this case, we determine whether the trial court's conclusions are "legally correct" under a *de novo* standard of review. *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609 (2002). "Because the Legislature used mandatory language and distinguished child care expenses from basic support obligations, we hold that child care expenses always fall outside of the chancellor's discretion...." *Chimes v. Michael*, 131 Md.App. 271, 292–93, 748 A.2d 1065 (2000). In addition, we note that, in a legal context, use of the word "actual" means, *inter alia*, "Something real, in opposition to constructive or speculative.... It is used as a legal term in contradistinction to [the terms] virtual or constructive...." *Black's Law Dictionary* 34 (6th ed.1990).

Here, the wife provided evidence of the cost of child care on a part-time basis. While that amount also included housecleaning services valued at $100.00 per day, it was possible to subtract the cost for housecleaning and extrapolate the expense of full-time child care. However, being able to ascertain the amount that child care would cost is not the same as awarding that amount for child care that is not actual or needed because the custodial parent is not working. The trial court directed the husband to pay the wife as if she were working full-time based upon a finding that she had impoverished herself, and imputed a working full-time income of $45,000, when, at most, she was actually working part time. Thus, the burden was improperly placed upon the husband to return to court to establish that the wife was not incurring full-time child care costs, even though she had failed to meet

her burden at the time the court ruled. "The court fairly could consider [wife's] actual child care experience in the months prior to trial in making that determination." *Lacy v. Arvin*, 140 Md.App. 412, 432–33, 780 A.2d 1180 (2001). There was no evidence that the wife had arranged for full-time employment or even that she was seeking such employment. Any award of child care costs beyond that necessary for the time the wife actually was away from home due to employment was not "actual" but, rather, entirely speculative and improper.

## II.

The parties did not dispute that the wife should have primary physical custody of the children, and the trial court agreed. With respect to legal custody, the court found that, during the marriage, the wife had made final decisions and concluded:

I think it is unwieldy to say, all right, you are going to discuss and if you can't agree then we come back to Court.

So, I am going to look and I'm going to say that she has been the primary caretaker of these children from the beginning.

She has made most of the decisions after discussion if you couldn't agree in the past. I think it is appropriate that if there is, after full discussion of these issues, after both sides talk and give their viewpoints, if you can agree, and again, if you don't discuss them, then you're going to be in violation of the order.

So, if you just go ahead and sign the kids up for something without checking with dad, then it is going to be a violation of the order.

He will be running back in here asking that you be held in contempt of Court for failing to follow through. So, all you have to do is discuss these things.

As time goes by, I think you [are] going to find with this litigation further and further behind you, that you both are going to be very proud of these kids.

You are both going to participate in their upbringing. You are both going to help make those decisions. You are going to want the input of the other party.

You did when you had them and you ought to now. So, you are going to discuss those important issues. You are going to discuss them thoroughly.

If after you have discussed them, you can't both agree on an informed, intelligent decision, then Ms. Shenk is going to make the final decision.

This arrangement was incorporated into the court's written Judgment in the following language:

ORDERED that the parties are awarded joint legal custody of their three children. That is, the parties shall keep one another fully informed regarding the health and general welfare of the children and, with the exception of an emergency, no significant decision regarding any of the children shall be made prior to the matter being thoroughly discussed between the parties. If the parties are unable to reach an agreement with respect to such a decision, [the wife] shall have the authority to make the final decision.

The husband argues that the trial court did not have the authority to order joint legal custody if, in the event of a disagreement, one parent is designated as a "tie breaker." In the alternative, he argues that, even if the arrangement was not improper, it was not supported by the evidence. We hold that the trial court acted within its legal authority and that it did not abuse its discretion.

-background-

The history of child custody begins with a common law paternal preference in child custody awards. The typical custody dispute merely focused on identifying the father, and an award to that person was made accordingly. "[T]he *pater familias* was entitled to the custody of his offspring as an absolute legal right regardless of the welfare of the child." *Montgomery County Dept. of Social Services v. Sanders*, 38 Md.App. 406, 414–15, 381 A.2d 1154 (1977). Subsequently,

there was a shift to a maternal preference, with the primary objective of identifying the mother, and an award to that person was made accordingly.

Article 72A, "Parent and Child," was added to the Maryland Code by Chapter 561 of the 1929 Laws of Maryland and took effect as of June 1, 1929.[1] Despite its mandate that "[the parents] shall have equal powers and duties, neither parent has any right superior to the right of the other concerning the child's custody," the Court of Appeals continued to recognize the maternal preference principle. *See Hild v. Hild,* 221 Md. 349, 157 A.2d 442 (1960); *Oliver v. Oliver,* 217 Md. 222, 140 A.2d 908 (1958); *Trudeau v. Trudeau,* 204 Md. 214, 103 A.2d 563 (1954).

In *Hild, supra,* the Court recognized that "modern courts invariably hold that the best interests and welfare of the child should be primarily considered in making an award of custody. . . ." Nevertheless, "[s]ince the mother is the natural custodian of the young and immature, custody is ordinarily awarded to her, at least temporarily, in legal contests between parents when other things are equal, even when the father is without fault, provided the mother is a fit and proper person to have custody." 221 Md. at 357, 157 A.2d 442. This maternal preference is also known as the "tender years doctrine," whereby it was presumed that young children should be placed in the care of the mother. This is shown by the Pennsylvania Supreme Court, in *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977), which held that the "tender years" doctrine, which is Pennsylvania's equivalent of Maryland's maternal preference doctrine. . . ." *Giffin v. Crane,* 351 Md. 133, 153, 716 A.2d 1029 (1998).

---

1. Art. 72A, section 1, was repealed by 1984 Md. Laws, Chap. 296, section 1. *See* similar language in Maryland Code (1984, 1991 Rep. Vol., 1998 Cum.Supp.), section 5–203(b)(1) of the Family Law Article ("The parents of a minor child are jointly and severally responsible for the child's support, care, nurture, welfare, and education. . . ."). *See* Md. Code (1957, 1983 Repl.Vol.), Art. 72A, § 1, repealed by 1984 Md. Laws, Chap. 296, § 1.

During the period of time that the maternal preference dominated custodial awards, the courts placed the burden on the father to prove the mother was unfit if the father was to have any chance of being awarded custody.

In *Rand v. Rand*, 280 Md. 508, 516, 374 A.2d 900 (1977), the Court stated that the language of Art. 72A, section 1, combined with adoption of the E.R.A., mandated the conclusion that child support awards must be made on a sexless basis. Finally, *Elza v. Elza*, 300 Md. 51, 475 A.2d 1180 (1984), is also instructive, as is the legislature's recodification, as a part of code revision, of former Article 72A section 1. The issue in *Elza* was the validity of the maternal preference presumption and whether the trial court in a child custody proceeding erred in basing its award of custody to the mother solely on it. The Court stating that the 1974 amendment to Art. 72A, section 1, by providing, clearly and unambiguously, that "neither parent shall be given preference solely because of his or her sex," expressed the intent of the General Assembly to eradicate sex as a factor in child custody proceedings. Therefore, the Court abolished the maternal preference doctrine in this State because it permitted custody to be awarded solely on the basis of the mother's sex.

After this period, we abandoned the maternal preference in favor of gender-neutral rules and applied, regardless of gender, the best interests of the child test. This standard does recognize that both parents have rights.

-present case-

As the above background discloses, law, particularly family law, is never finished. The latest development in child custody came with joint custody in *Taylor v. Taylor*, 306 Md. 290, 508 A.2d 964 (1986). Joint custody is typically broken down into joint legal custody and joint physical custody.

In *Taylor*, the Court of Appeals said that legal custody of a child

carries with it the right and obligation to make long range decisions involving education, religious training, discipline,

medical care, and other matters of major significance concerning the child's life and welfare.

The Court continued, "Joint legal custody means that both parents have an equal voice in making those decisions, and neither parent's rights are superior to the other." 306 Md. at 296, 508 A.2d 964.

In post-divorce conflicts neither spouse wants to change "first," particularly after all the posturing in many divorce actions. Conflicts in the post-divorce period typically revolve around one or more of several areas including unresolved marital issues, lingering anger and hurt about the divorce, conflicts with or over new partners, or fruitless power struggles that revolve only around efforts to "win" over the ex-spouse, such "wins" often being a Pyrrhic victory. Unfortunately, reason directs but a trivial portion of such strife, the predominate portion pursues feeling, right or wrong, and passion, good or bad.

To avoid endless litigation that seems generic to family law, the domestic bench is thus faced with a dilemma if the position of the appellant is correct—either award the legal custody to a single parent, or chronically anticipate post-divorce disputes by proactively including provisions in its custody decree, *e.g.*, ordering the use of a mediator, either selected by the court or the parties themselves, to resolve such conflicts. Such an order may also specify that the couple must attempt resolution through mediation prior to returning to the courtroom. This approach may be very much appreciated by the family law judges, because many frivolous or unnecessary return trips to court may well be prevented.

While any particular resolution of a probable continued conflict has strengths and weaknesses, it is obvious that the success of any particular arrangement is far more dependent on the ability of the parents to engage in positive communication. The parties should be urged to "Come, agree, the law's costly." [2]

---

2.  Jonathan Swift.

The Court here adopted "a tie-breaker" as another proactive provision to anticipate a post-divorce dispute. It is this "tie-breaker" that the husband urges us to find prohibited under the language in *Taylor* that he believes precludes any variation designed to suit the needs of particular parents or children. We disagree. His interpretation is not mandated by *Taylor*, in which the Court expressly acknowledged the existence of "multiple forms" of joint custody and also stated that "[f]ormula or computer solutions in child custody matters are impossible because of the unique character of each case, and the subjective nature of the evaluations and decisions that must be made." 306 Md. at 303, 508 A.2d 964.

It is clear that the trial court felt that the parties should share responsibility for the major decisions affecting the lives of their children. It is equally clear that the court was concerned that disagreements about trivial matters might result in renewed litigation. Under *Taylor*, the court was empowered to "continue the joint custody that has existed in the past." 306 Md. at 301, 508 A.2d 964. The court did just that, adding only an exhortation that both sides must be given the opportunity to present their views. The court made it clear to the parties that any failure to discuss issues involving the children would be a violation of its orders and emphasized that the mother was not to act without consulting the father.

The accommodation fashioned by the trial court does not transform the arrangement into something other than joint custody. Instead, it illustrates how the "multiple forms" of joint custody can be tailored into solutions for each unique family, in keeping with the "broad and inherent power of an equity court to deal fully and completely with matters of child custody". 306 Md. at 301, 508 A.2d 964; FL § 1–201(a). The law should never be the prisoner of ideas.

Whether the trial court abused its discretion in evaluating the suitability of the parties for any form of joint custody is another issue. The paramount concern must always be the best interests of the children; while various factors are consid-

ered, this is the "objective to which virtually all other factors speak." 306 Md. at 303, 508 A.2d 964.

Three of those subsidiary factors are involved in the instant case: The capacity of the parents to communicate and to reach shared decisions affecting the children's welfare, the willingness of the parents to share custody, and the sincerity of the parents' requests. The trial court was presented with ample evidence to determine that each factor was satisfied.

With regard to the capacity of the parents to communicate, the trial court expressed concern that the parties were unable to speak directly, but, instead, wrote notes to each other. Nevertheless, the court was swayed by the testimony of the parties and other witnesses close to the family that both parents agreed on the ultimate outcomes of the decisions made on behalf of the children. The parties had agreed on physical custody and visitation. There was no evidence that either party had attempted to turn the children against the other. The most serious dispute identified by the mother involved the children's attendance at a Catholic school, and the father did not question the decision, but only expressed concern that the mother's parents were paying the tuition. In addition, the court noted the intensity of emotion produced by litigation, and expressed confidence that the parties would do even better at communicating as time passed.

The court credited the parties' testimony that they were willing to discuss decisions involving the children, noting that the mother wanted only to be able to break a tie and the father simply wanted the decisions to be discussed between the two of them. The court also believed that the father's desire to participate in his children's lives was sincere, as was the mother's willingness to involve him. We will not second-guess the trial court's assessment of the demeanor and credibility of the witnesses. *Petrini v. Petrini*, 336 Md. 453, 470, 648 A.2d 1016 (1994).

Based upon the evidence presented, and giving deference to the trial court's ability to evaluate the credibility of the witnesses, we conclude that there was no abuse of discretion in

the court's evaluation of the factors relevant to the determination of custody.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

**CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR RECONSIDERATION OF ISSUE I.**

**COSTS TO BE DIVIDED EQUALLY.**