*Adam Santo v. Grace Santo*, No. 89, September Term, 2015, Opinion by Adkins, J.

**FAMILY LAW — CHILD CUSTODY — JOINT LEGAL CUSTODY — TIE-BREAKING PROVISIONS:** The court did not abuse its discretion in awarding the parties joint legal custody with tie-breaking provisions over several matters affecting their children.  Although the parties lack the capacity to communicate or cooperate well, that factor is not a prerequisite under *Taylor v. Taylor*, 306 Md. 290 (1986) for a legally valid joint custody order.  Moreover, trial courts in Maryland are legally authorized to use tie-breaking provisions in custody awards.  The use of such provisions in this case was not an abuse of discretion in light of the parties' inability to make decisions together.

Circuit Court for Montgomery County
Case No.: 87541
Argued: May 5, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 89

September Term, 2015

ADAM SANTO

v.

GRACE SANTO

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Battaglia, Lynne A. (Retired,
        Specially Assigned),

JJ.

Opinion by Adkins, J.
Watts and Battaglia, JJ., concur.

Filed: July 11, 2016

In *Taylor v. Taylor*, 306 Md. 290, 293 (1986), we decided that an award of joint custody was a permissible exercise of a trial court's general equity powers. Notably, we also explained in *Taylor* that the most important factor for a court to consider before awarding joint custody is the capacity of the parents to communicate and to reach shared decisions affecting a child's welfare. *Id.* at 304. Today we address whether a court abused its discretion in awarding joint custody in spite of evidence that, to put it mildly, the parents could not communicate and reach shared decisions for their two children. As a related matter—one not addressed explicitly in *Taylor*—we consider the propriety of the use of provisions in joint custody awards that grant one parent the authority to make a decision about a matter affecting the child when the parents cannot agree. We call these tie-breaking provisions.

## FACTS AND LEGAL PROCEEDINGS

Adam Santo ("Father") and Grace Santo ("Mother") married in 2000 and divorced in 2011. They have two sons, who were eight and five years old, respectively, at the time of the divorce. Following a 2011 order of joint legal custody, the Santos renewed the battle over their children by filing more motions. Custody was modified in 2013 to, among other things, facilitate joint custody through the use of a parenting coordinator. Several other motions are indicative of their ongoing struggle.

The precise motion that led to the question we review today was Father's 2014 motion to modify custody. Therein Father sought sole custody of his sons so that, he maintains, "the children will not remain in a combat zone forever." Following a three-day hearing, the Circuit Court for Montgomery County denied Father's motion and preserved

a joint custody arrangement.  We shall discuss the court's findings and the details of that arrangement *infra*, particularly the tie-breaking provisions awarded to each parent.

Father noted a timely appeal, and the Court of Special Appeals affirmed the Circuit Court's decision in an unreported opinion.

Father filed a Petition for Writ of Certiorari to this Court, which we granted[1]:

> Whether the trial court abused its discretion in ordering joint custody in light of *Taylor v. Taylor*, 306 Md. 290 (1986)?

Because we answer no, we shall affirm the judgment of the Court of Special Appeals.

## STANDARD OF REVIEW

We review a trial court's custody determination for abuse of discretion.  *Petrini v. Petrini*, 336 Md. 453, 470 (1994).  This standard of review accounts for the trial court's unique "opportunity to observe the demeanor and the credibility of the parties and the witnesses." *Id.*

Though a deferential standard, abuse of discretion may arise when "'no reasonable person would take the view adopted by the [trial] court' or when the court acts 'without reference to any guiding rules or principles.'" *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997) (internal citations omitted).  Such an abuse may also occur when the court's ruling is "'clearly against the logic and effect of facts and inferences before the

---

[1] We have rephrased Father's question, which in his Petition asks: "Whether the so-called '*Taylor* factors,' in particular the requirement that parents effectively communicate to make shared parenting decisions in the children's best interests, continue to constitute binding legal parameters, circumscribing the discretion of a custody court faced with a 'joint' versus 'sole' legal custody decision."

court' or when the ruling is 'violative of fact and logic.'" *Id.* (internal citations omitted). Put simply, we will not reverse the trial court unless its decision is "'well removed from any center mark imagined by the reviewing court.'" *Id.* at 313 (citation omitted).

The light that guides the trial court in its determination, and in our review, is "the best interest of the child standard," which "is always determinative in child custody disputes." *Ross v. Hoffman*, 280 Md. 172, 178 (1977).

## DISCUSSION

Father avers that the Circuit Court erred because it did not follow the "*sine qua non* for an award of joint legal custody" as established in *Taylor v. Taylor*, 306 Md. 290 (1986). In his view, an award of joint legal custody *requires* that the parents effectively communicate or will be capable of making parenting decisions together in the future. The record and the Circuit Court's findings, Father contends, reflect a tale of "parties [who] have been and remain at war with one another." He thus maintains that it was an abuse of discretion for the Circuit Court to have granted an award of joint custody to parents whom it knew could not communicate effectively.

Mother disagrees, and reads *Taylor* as merely setting forth "nonexclusive factors" for a court to apply in a custody dispute. Mother maintains that *Taylor* requires the court to consider "all factors and options available" to determine "what is in the best interest of the children." In Mother's view, the Circuit Court did just that—applied the relevant factors, considered options, and made a decision for the children's best interests.

## *Taylor v. Taylor*

We begin our analysis of *Taylor* by reviewing the Court's explication of legal and physical custody, and joint legal and joint physical custody—terms important to our discussion. "Legal custody carries with it the right and obligation to make long range decisions" that significantly affect a child's life, such as education or religious training. *Taylor*, 306 Md. at 296. "Physical custody, on the other hand, means the right and obligation to provide a home for the child and to make" daily decisions as necessary while the child is under that parent's care and control. *Id.*

In joint legal custody, the *Taylor* Court explained, "both parents have an equal voice in making [long range] decisions, and neither parent's rights are superior to the other." *Id.* In joint physical custody, the parents will share or divide custody of the child, but not necessarily "on a 50/50 basis." *Id.* at 297. With respect to a circuit court's authority in child custody cases, "the power of the court is very broad so that it may accomplish the paramount purpose of securing the welfare and promoting the best interest of the child." *Id.* at 301–02. To assist trial courts "in determining whether joint custody is appropriate," the *Taylor* Court offered up "the major factors" to consider. *Id.* at 303.[2]

---

[2] Although the majority of jurisdictions have statutory factors for courts to consider in custody cases, Maryland does not. *See* Linda D. Elrod & Robert G. Spector, *A Review of the Year in Family Law: Numbers of Disputes Increase*, 45 Fam. L.Q. 443, 494–96 (2012) (denoting which jurisdictions have statutory factors and which do not).

The only statutory directive relates to child abuse or neglect, which is not pertinent here. Under Md. Code (1984, 2012 Repl. Vol.), § 9-101 of the Family Law Article ("FL"), a trial court must determine if there are "reasonable grounds to believe" that a child has been abused or neglected by a party seeking custody. If there are reasonable grounds, the

To be sure, the *Taylor* Court saw "the most important factor" in deciding whether to award joint legal custody as the "capacity of the parents to communicate and to reach shared decisions affecting the child's welfare."[3] *Id.* at 304. As it explained, "there is nothing to be gained and much to be lost by conditioning the making of decisions affecting the child's welfare upon the mutual agreement of" parents who are "severely embittered" and whose "relationship [is] marked by dispute, acrimony, and a failure of rational communication." *Id.* at 305.

In other words, *Taylor* stands for the proposition that effective parental communication is weighty in a joint legal custody situation because, under such circumstances, parents are charged with making important decisions together that affect a child's future. If parents cannot make those decisions together because, for example, they are unable to put aside their bitterness for one another, then the child's future could be compromised.

To further guide trial courts in evaluating parental communication, the *Taylor* Court explained that "the best evidence" a court should look for is "past conduct or [a] 'track record' of the parties." *Id.* at 307. "Rarely, if ever," is a joint legal custody award

---

court must make a finding that there is no further likelihood of abuse or neglect before awarding unsupervised custody to that person.

[3] The other factors the Court expressly discussed in *Taylor v. Taylor*, 306 Md. 290, 307–11 (1986) were the willingness of the parents to share custody, the fitness of the parents, the relationship established between the child and each parent, the preference of the child, the potential disruption of the child's social and school life, the geographic proximity of parental homes, the demands of parental employment, the age and number of children, the sincerity of the parents' request, the financial status of the parents, the impact on state or federal assistance, and the benefit to the parents.

permissible, the Court stated, absent such conduct, "and then only when it is possible to make a finding of a strong potential for such conduct in the future." *Id.* at 304. In the latter circumstance, the Court said, "the trial judge must articulate fully the reasons that support that conclusion." *Id.* at 307.

In asking us to hold that joint legal custody "should be awarded *only if* a custody court" concludes that parents "are or likely will be capable of communicating and reaching joint (i.e., shared) parenting decisions," Father would have us impose an inflexible template on equity courts making child custody decisions. (Emphasis added.) But, as the *Taylor* Court recognized, "[f]ormula[s] or computer solutions in child custody matters are impossible because of the unique character of each case, and the subjective nature of the evaluations and decisions that must be made." *Id.* at 303. To elevate effective parental communication so that it becomes a prerequisite to a joint custody award would undermine the trial court's complex and holistic task. On this point, *Taylor* is and remains vitally instructive:

> The resolution of a custody dispute continues to be one of the most difficult and demanding tasks of a trial judge. It requires thorough consideration of multiple and varied circumstances, full knowledge of the available options, including the positive and negative aspects of various custodial arrangements, and a careful recitation of the facts and conclusions that support the solution ultimately selected.

*Id.* at 311.

Courts in other jurisdictions that, like Maryland, have no applicable statutory factors, concur that no one factor serves as a prerequisite to a custody award. *See, e.g.*, *Clark v. Reiss*, 831 S.W.2d 622, 624 (Ark. Ct. App. 1992) ("The prime concern and

6

controlling factor is the best interest of the child, and the court in its sound discretion will look into the peculiar circumstances of each case and act as the welfare of the child appears to require."); *Hamby v. Hamby*, 102 So. 3d 334, 337 (Miss. Ct. App. 2012) ("The *Albright* [*v. Albright*, 437 So. 2d 1003 (Miss. 1983)] factors are a guide for chancellors in weighing the facts to determine the child's best interest.") (citation and internal quotation marks omitted); *Eschbach v. Eschbach*, 436 N.E.2d 1260, 1263 (N.Y. 1982) ("'[N]o agreement of the parties can bind the court to a disposition other than that which a weighing of all the factors involved shows to be in the child's best interests.'") (citation omitted); *Hall v. Hall*, 655 S.E.2d 901, 905 (N.C. Ct. App. 2008) ("'These findings may concern physical, mental, or financial fitness or any other factors brought out by the evidence and relevant to the issue of the welfare of the child.'") (citation omitted); *Waters v. Magee*, 877 A.2d 658, 664–65 (R.I. 2005) ("No one factor is determinative; rather, the trial justice should consider a combination of and an interaction among all the relevant factors.") (citation and internal quotation marks omitted); *Scott v. Scott*, 579 S.E.2d 620, 623 (S.C. 2003) ("[I]n making custody decisions 'the totality of the circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed.'") (citation omitted); *Hathaway v. Bergheim*, 648 N.W.2d 349, 352 (S.D. 2002) ("These factors serve as guidelines and the trial court need not address all of them."); *but see Foshee v. Foshee*, 247 P.3d 1162, 1168–69 (Okla. 2010) ("[J]oint custody is not proper where the parents are unable to cooperate.").[4]

---

[4] In jurisdictions with statutory factors, the statutes do not contain restrictive language but instead expansive language such as "including" or "any other factor." *See,*

Based on *Taylor*, and our review of other jurisdictions, we decline to hold as a matter of law that a court errs if it awards joint custody to parents who fail to communicate effectively with one another. As the *Taylor* Court cautioned, "*none*" of the major factors in a custody case "has talismanic qualities, and [] no single list of criteria will satisfy the demands of every case." *Id.* at 303 (emphasis added).

Consistent with *Taylor*, we emphasize that a trial court should carefully set out the facts and conclusions that support the solution it ultimately reaches. To use words from Father's brief, no "robotic recitation that a custody award proposed by a custody court is in the 'child's best interest' serve[s] as a replacement for the serious consideration" of the facts and circumstances of each case. This is especially so in those cases where a court considers awarding joint legal custody to parents who cannot communicate effectively. In such cases, a court must articulate well the justifications for awarding joint custody.

### Tie-Breaking Provisions in Joint Legal Custody Awards

Neither party disputes that this is a case in which a trial court awarded joint custody to parents who do not communicate well. As the Circuit Court explained, "[t]hese parents have essentially been at war with each other since 2010." Anticipating that these parents would not succeed in making all decisions on behalf of their children, the Circuit Court included tie-breaking provisions in the award so one parent would have the last word if they reached an impasse.

---

*e.g.*, Ariz. Rev. Stat. Ann. § 25-403A (West, Westlaw through 2016 2d Reg. Sess.); Cal. Fam. Code § 3011 (West, Westlaw through ch. 22 of 2016 Reg. Sess.).

Father argues that such provisions are inconsistent with *Taylor* and Md. Code (1984, 2012 Repl. Vol.), § 5-203(d) of the Family Law Article ("FL"). FL § 5-203(d) provides that "a court may award custody of a minor child to either parent or joint custody to both parents." FL § 5-203(d). Reading this section of the statute literally, Father avers that Maryland courts have two options—award sole *or* joint custody—but no option to create "hybrids of the two." He also fears that the use of tie-breaking provisions "has exponentially expanded" into "spheres of major importance." Finally, Father argues that, as a practical matter, tie-breaking provisions may promote conflict or simply be ineffective.[5]

In *Shenk v. Shenk*, 159 Md. App. 548, 556 (2004) the Court of Special Appeals held that the trial court "acted within its legal authority" in awarding joint legal custody and designating one parent as the "tie[-]breaker" if the parents disagreed about a matter

---

[5] Mother contends that Father's argument about tie-breaking provisions is not preserved for our review. What Mother overlooks is that this issue was "*decided by the trial court*." Maryland Rule 8-131(a) (emphasis added.) That is, the Circuit Court granted joint legal custody and said "there will be specific tie[-]breaker authority as follows," which the court then discussed.

Additionally, we have previously determined that an issue that a party fails to present to the trial court is reviewable when the issue "transcends" that case, "may affect hundreds of cases," "implicates important" rights, and where "guidance is needed." *See Chaney v. State*, 397 Md. 460, 468 (2007) (reviewing a challenge to a restitution order that the appellant never presented in his complaint to the trial court). We agree with Father that when tie-breaking provisions reach "spheres of major importance" in children's lives, as in this case, the issue meets the *Chaney* standards.

affecting their children.[6]  The intermediate appellate court rejected the argument that *Taylor* precluded such an award by noting that *Taylor* "expressly acknowledged the existence of 'multiple forms' of joint custody" and rejected formulaic approaches to child custody matters as inconsistent with the "'unique character of each case.'"  *Id.* at 560 (quoting 306 Md. at 303).  In the intermediate appellate court's view, joint legal custody with tie-breaking authority in one parent was still joint custody.  *Id.* ("The accommodation fashioned by the trial court does not transform the arrangement into something other than joint custody.").  Finally, the *Shenk* court reasoned that the trial court's ability to fashion such an award was "in keeping with the 'broad and inherent power of an equity court to deal fully and completely with matters of child custody.'"  *Id.* (quoting *Taylor*, 306 Md. at 301).

Here we decide whether a custody award—comparable to that in *Shenk*—comports with the *Taylor* Court's formulation of joint legal custody.  The *Taylor* Court defined joint legal custody as "both parents hav[ing] an equal voice in making [long range] decisions [of major significance concerning the child's life and welfare], and neither parent's rights [being] superior to the other."  306 Md. at 296.  In a joint legal custody arrangement with tie-breaking provisions, the parents are ordered to try to decide together matters affecting their children.  When, and only when the parties are at an impasse after deliberating in good faith does the tie-breaking provision permit one parent to make the final call.  Because this

---

[6] According to our research, *Shenk v. Shenk*, 159 Md. App. 548 (2004) is the first reported Maryland appellate case with a decision on the propriety of tie-breaking provisions.

arrangement requires a genuine effort by both parties to communicate, it ensures each has a voice in the decision-making process.

To be sure, the *Taylor* Court's definition of joint legal custody places parents' decision-making rights on an equal footing; indeed, it characterizes their voices as being equal. *See id.* A delegation of final authority over a sphere of decisions to one parent has the real consequence of tilting power to the one granted such authority.

But such an award is still consonant with the core concept of joint custody because the parents must try to work together to decide issues affecting their children. *See Ronny M. v. Nanette H.*, 303 P.3d 392, 405 (Alaska 2013) ("The court's approach [awarding joint legal custody with final decision-making authority to mother] is reasonably intended to encourage both parents to communicate and attempt to make decisions about their children . . . ."). We require that the tie-breaker parent cannot make the final call until *after* weighing in good faith the ideas the other parent has expressed regarding their children. *Cf. State on behalf of Maddox S. v. Matthew E.*, 873 N.W.2d 208, 219 (Neb. Ct. App. 2016) ("We also point out that the court maintained the goal of 'mutual agreement' between the parties . . . .; only now, the final say as to certain major issues rests with the designated parent if they cannot otherwise agree."). Such an award has the salutary effect of empowering both parents to participate in significant matters affecting their children.[7] *See*

---

[7] As the Court in *Taylor*, 306 Md. at 311 aptly noted:

> Although the primary focus is properly upon the best interest
> of the child, it is also appropriate to consider the salutary effect
> that joint custody may have on the parents, not only because
> their feelings and interests are worthy of consideration, but also

11

*Shea v. Metcalf*, 712 A.2d 887, 891 (Vt. 1998) ("By avoiding an 'all or nothing approach,'
the order keeps both parents in the role of active parenting, takes full advantage of their
individual strengths, and avoids awarding either parent responsibility for which he or she
is not suited."). Because this arrangement requires both parties to attempt to make
decisions together, it is a form of joint custody. *See Taylor*, 306 Md. at 303 ("The
availability of joint custody, in any of its multiple forms, is but another option available to
the trial judge.").[8]

The requirement of good faith communication between the parents helps to ensure
the parent with tie-breaking authority does not abuse the privilege of being a final decision-
maker. And a court has the means to sanction a breach of good faith. In *Downing v. Perry*,
123 A.3d 474, 483–85 (D.C. 2015), the District of Columbia Court of Appeals affirmed a
trial court order of joint legal custody that transferred final decision-making authority from
the father to a neutral third party because the father had abused this privilege. Among other
things, the *Downing* court emphasized the trial court's finding that the father had "rigid[ly]

---

because their improved self-image as parents is likely to
redound to the ultimate benefit of the child.

[8] The *Taylor* Court did not explore the possibility or permissibility of tie-breaking
provisions in a joint custody arrangement. But we do not infer the Court's silence on the
issue to constitute a rejection thereof. As an initial matter, joint custody was still a fairly
new concept around the time of *Taylor*. *See, e.g.*, Child Custody Practice and Procedure
§ 5:1, at 582 (Linda D. Elrod ed. 2015) ("Although there were instances of 'divided'
custody, 'joint' custody did not emerge as a legislated custody option until the early
1970s."). Moreover, our research suggests that the use of tie-breaking provisions in joint
custody awards is quite a recent innovation in child custody cases. Only one jurisdiction
to approve of such an award did so before *Taylor* and many published cases have come
down in just the past few years.

exercise[d]" tie-breaking authority granted him under a prior agreement based on a "patterned negative response [to the mother's] suggestions, rather than making decisions in the child's best interest." *Id.* at 484. Even though both parents had "equal rights," the *Downing* court explained that the father "was using his tie-breaking authority as a form of *de facto* sole legal custody." *Id.* at 484 n.11.

*Downing* underscores that tie-breaking authority does not eliminate the voice of the parent without that authority. Rather, such measure pragmatically reflects the need for *some* decision to be made *for the child* when parents themselves cannot agree. It is the child, after all, whom the court must consider foremost in fashioning custody awards. *See Taylor*, 306 Md. at 301–02 ("As has historically been the case, the power of the court is very broad so that it may accomplish the paramount purpose of securing the welfare and promoting the best interest of the child.").

Other jurisdictions have affirmed awards of joint custody with tie-breaking provisions precisely because of the parties' inability to make decisions for their children. *Bonner v. Bonner*, 170 So. 3d 697, 703 (Ala. Civ. App. 2015) ("The trial court's judgment [awarding joint custody], however, resolved those types of conflicts by designating the husband as the primary decision maker regarding the child's education."); *Schneider v. Schneider*, 864 So. 2d 1193, 1994–95 (Fla. Dist. Ct. App. 2004) (affirming award of shared parental responsibility with final-decision making authority to wife and noting that "[g]iven the hostility between the parties throughout this litigation, the trial court imposed a sensible plan"); *Rembert v. Rembert*, 674 S.E.2d 892, 894 (Ga. 2009) ("Thus, it is unlikely that they will agree on these issues; the need to designate a final decision-maker is apparent; and the

13

trial court did not abuse its discretion in selecting the primary custodial parent as that decision-maker [in its joint custody award].”); *Glidewell v. Glidewell*, 869 N.W.2d 796, 808 (Wis. Ct. App. 2015) (affirming joint custody with division of decision-making duties where “the anger that [the parents] ha[d] towards one another cloud[ed] their judgment and prevent[ed] them from making important collective decisions on behalf of their children”).[9]

Other jurisdictions view joint custody awards with tie-breaking provisions as pragmatic solutions to the problem of parents failing to make decisions in a timely manner *for their children's benefit*. *State on behalf of Maddox S.*, 873 N.W.2d at 218–19 (“Ultimately, by dividing responsibilities and designating which parent had the final say with regard to certain decisions [in the joint custody award], the court minimized the potential for conflict and the ongoing power struggle between the parties—something that is certainly in Maddox's best interests.”); *Thomas v. Thomas*, 757 S.E.2d 375, 382 (N.C. Ct. App. 2014) (“‘Given the parties' dysfunctional relationship history and the current level of conflict between the parties, unless one parent is given final decision making authority on important issues, joint legal custody is not in [the minor child's] best interest in light of the risk of delay in making timely decisions[.]’”); *Hall*, 655 S.E.2d at 907 (“Those findings must detail why a deviation from ‘pure’ joint legal custody is in the *best interest of the children*. As an example, past disagreements between the parties regarding matters affecting the children, such as where they would attend school or church, would be

---

[9] *See also Baker-Grenier v. Grenier*, 83 A.3d 698, 700–01 (Conn. App. Ct. 2014) (affirming joint custody award with final decision-making authority and noting that “the plaintiff ‘harbors too much anger . . . which affects her dealings with’ the defendant”).

sufficient . . . .") (emphasis in original) (footnote omitted); *cf. In re Marriage of McSoud*, 131 P.3d 1208, 1214 (Colo. App. 2006) ("A disagreement regarding routine immunizations for the child was sufficiently severe and prolonged that a court hearing had been scheduled to resolve it . . . ."). We thus disagree with Father that a joint custody award with tie-breaking provisions would likely be ineffective or promote conflict.[10]

For us now to constrain trial courts in fashioning awards in the best interests of the child at the center of a dispute would be plainly inconsistent with our recognition in *Taylor* that such courts have "broad and inherent power" as equity courts "to deal *fully and completely* with matters of child custody." 306 Md. at 301 (emphasis added). In short, trial courts have broad discretion in *how* they fashion relief in custody matters.[11]

---

[10] Father maintains that there is an "ongoing debate" about whether the notion of tie-breaking authority is consonant with joint legal custody. His argument, which rests entirely on a conflict between two New York state intermediate appellate decisions, is belied by the substantial number of jurisdictions that have affirmed awards of joint custody with tie-breaking provisions.

[11] The American Law Institute ("ALI") supports the allocation of decision-making authority to parents jointly. ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.09 (2002) (adopted May 16, 2000) ("[T]he court should allocate responsibility for making significant life decisions on behalf of the child . . . to one parent or to two parents jointly . . . ."). Importantly, the ALI states that "[d]ecision[-]making responsibility may be allocated as a whole, *or by separate areas*." *Id.* § 2.09 cmt. a (emphasis added); *see also id.* § 2.09 cmt. b., illus. 1 ("The court should allocate decision[-]making responsibility for health care for Paul in the parenting plan to either Roger or Mary [Paul's divorced parents]. Health-care decisions for Paul and disputes over them are virtually inevitable and, on these facts, Roger and Mary are unlikely to agree about them when the time arises.").

15

*Father's Statutory Argument Against Tie-Breaking*

Father nevertheless attacks the award of joint custody with tie-breaking provisions as illegal, on grounds that it violates FL § 5-203 as a custody award that is neither single nor joint, but a hybrid of the two—an option not set forth in the statute. The fallacy in Father's argument is that it presumes that the court's authority to award custody is derived strictly from statute. This is incorrect. Rather, it is a long-established rule of construction in Maryland that "statutes are to be construed in reference to the principles of the common law. For it is not to be presumed that the [L]egislature intended to make any innovation upon the common law, further than the case absolutely required." *Hooper v. City of Balt.*, 12 Md. 464, 475 (1859); *see The Arundel Corp. v. Marie*, 383 Md. 489, 502 n.5 (2004); *see also* 1A Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 26:5, at 600 (7th ed. 2009) ("Statutes declaratory of the common law are coextensive with the common law and no change in meaning is presumed to have been intended by their enactment."). Consistent with this rule of construction, we said in *Taylor* that "[o]ur inquiry [] is not whether the [the General Assembly] has *granted* a power, but whether it has attempted to *limit* a power that exists as a part of the inherent authority of the court." 306 Md. at 298 (emphasis added). The Court undertook this inquiry because the issue in *Taylor*—the authority to grant joint custody—"is an integral part of the broad and inherent authority of a court exercising its equitable powers to determine child custody." *Id.* In

16

addressing again the court's authority to grant joint custody, we undertake the same inquiry.

FL § 5-203(d) states that "[i]f the parents live apart, a court may award custody of a minor child to either parent or joint custody to both parents." The precursor to FL § 5-203 stated in pertinent part: "Where the parents live apart, the court may award the guardianship of the child to either of them . . . ." Maryland Code (1957, 1983 Repl. Vol.), § 1 of Article 72A. The *Taylor* Court analyzed the precursor and concluded that nothing therein limited "the broad and inherent power of an equity court to deal fully and completely with matters of child custody," and, pertinent in that case, to award joint custody. 306 Md. at 301. When FL § 5-203 was re-enacted and took effect shortly after *Taylor*,[12] the "bill codifie[d] existing case law" that approved of the authority of courts to award joint custody. Summ. of Comm. Rep., S. Judicial Proceedings Comm. H.B. 810 (1986) (citing *Kerns v. Kerns*, 59 Md. App. 87 (1984)). The General Assembly's decision to codify case law in FL § 5-203 established no limitation upon a trial court's equity powers to fashion custody awards. *See also Taylor*, 306 Md. at 300–01 n.9 ("We consider this amendment [in 1986 to FL § 5-203] to be declarative of existing common law."). Since 1986, the General Assembly has not amended this statute in any way that limited the court's authority to award custody. *Cf. R.H. v. B.F.*, 653 N.E.2d 195, 203 (Mass. App. Ct. 1995) (discussing custody statute that requires ability to communicate as prerequisite to joint

---

[12] *See* Act of July 1, 1986, ch. 65, 1986 Md. Laws 272.

17

custody award). There is, notably, no definition of joint custody in the Family Law Article that could arguably serve to constrain a trial court in fashioning such an award.

In sum, because we consider joint custody with tie-breaking provisions to be a form of joint custody, and because FL § 5-203(d) expressly authorizes joint custody without any limitations thereto, we hold that nothing in the statute precludes this award.[13]

### Trial Court's Decision

On a motion for modification of custody, a trial court employs a two-step process: (1) whether there has been a material change in circumstances, and (2) what custody arrangement is in the best interests of the children. *See In re Deontay J.*, 408 Md. 152, 166 (2009); *Nodeen v. Sigurdsson*, 408 Md. 167, 175 (2009) ("In either situation, the decision whether to modify is governed by the material change in circumstances and best interest standards.") (citation and internal quotation marks omitted).

Father argues that the Circuit Court abused its discretion because it awarded joint custody to two parents whom the court found to be utterly incapable of communicating.[14]

---

[13] Father also argues that *Shulick v. Richards*, 729 N.W.2d 533, 536, 538–39 (Mich. Ct. App. 2006) in which the Court of Appeals of Michigan rejected an award of joint legal custody with a division of decision-making responsibility, is apposite because the pertinent statute in *Shulick* "is not dissimilar to Maryland's present statutory custody *schema* as interpreted by this Court in *Taylor*." (Emphasis in original.) In *Shulick*, however, the court read a Michigan custody statute to provide for a joint custody arrangement "'*only where* "the parents will be able to cooperate [and generally agree on matters concerning important decisions affecting the welfare of]" their children.'" *Id.* at 539 (emphasis added) (citation omitted). FL § 5-203(d) however, does not limit a trial court's power to award custody, and so *Shulick* is inapposite.

[14] Father does not challenge the Circuit Court's determination that there was a material change of circumstances.

18

In Father's view, the court's reasoning that the parties should have joint legal custody "so that both of them have access to information about their children" is faulty because the parents are statutorily entitled to have access to records pertaining to their children. He further maintains that the Circuit Court "paid mere lip service to the *Taylor* [f]actors," particularly whether the parents could effectively communicate. The custody order strikes Father as simply ineffective in protecting his children from his toxic relationship with Mother.

Mother, on the other hand, reasons that the court was "within its discretion" because it found that the children needed both parents to be involved in their lives. She maintains that the court's finding of ineffective parental communication does not undermine the joint custody award because the Circuit Court proceeded to analyze the relevant factors under *Taylor* and articulated its reasons for awarding joint custody with tie-breaking provisions. She contends that Father's attempts to previously exclude her through his final decision-making authority are strong evidence supporting the court's decision to grant joint legal custody with tie-breaking provisions.

Once the Circuit Court explained that there was a material change in circumstances in the children's lives,[15] the court proceeded to engage in the following analysis of the *Taylor* factors, *see* 306 Md. at 304–11:

- **Parental fitness**: "This is a very complicated issue[]. Each of the parents loves and is capable of providing for the

---

[15] The court concluded: "The children are in danger of losing their school placement. Ironically, the parents agree that the arrangement they have does not work and is harming the children, and that joint custody and shared physical custody as now exists is not workable."

19

children. However, their unvarnished hatred of each other leads them to do and say things that are contrary to the welfare of the children."

- **The sincerity of the parents' requests**: "The request[s] are simple, each one [wants] sole legal custody and primary physical custody and to minimize the other's role in the lives of the children. They are sincere."

- **Parents' willingness to share custody**: "None."

- **Parents' capacity to communicate and make shared decisions**: "[T]hey're unable to function cooperatively."

- **Number of children**: "Mother has no other children, father and his wife have a daughter who is an infant."

- **Geographic proximity of parents' homes**: "Mother recently moved about 15 to 20 miles from the boy[s'] school. She does not seem to object to driving the distance to keep them at [this school], if that was a possibility."

- **Financial resources**: "Father earns more than twice what [M]other earns. Mother has filed for bankruptcy. Father is soliciting funds for legal fees on public bulletin boards. Father's wife is employed outside of the home, so he has help in meeting his household expenses."

- **Demands of parental employment**: "There was no testimony that there [w]as any interference with the parents['] ability to parent related to their jobs."

- **Relationships of parents with their children**: "There was no testimony about [M]other's relationship with the boys, other than her own, which was that it was good. Several witnesses noted [F]ather's good relationship with the boys."

- **Potential for disruption in the children's school and social lives**: "The children are in danger of losing their school placement."

- **Impact on state or federal assistance**: "There is no impact on state or federal assistance."

- **Benefit to parents**: "There is no benefit[], other than having the children with them for either parent."

- **Preferences of the children**: "There was no testimony presented about their preferences."

The Circuit Court also considered several other factors on the record[16]:

- **Character and reputation**: "[Father] had witnesses who say he is a fine citizen. The testimony about [M]other was critical of her combative style and non-cooperative approach. Neither parent presented well in court."

- **Agreements between the parties**: "None, other than the children's attendance at [their school] and that it has been a good thing for them."

- **Parents' ability to maintain relationships between the children and others who may affect the children's best interests**: "Neither parent has demonstrated skill in this category."

- **Parents' ability to maintain a stable, appropriate home**: "Each of the parties has ability to do so, [and] [F]ather's resources are greater."

A review of the record reveals a thoughtful, painstaking consideration of the relevant issues affecting the parties' custody dispute. The court was aware of the challenge it faced in fashioning an appropriate award, noting that "[t]his is a very difficult case." Indeed, before announcing its decision during its oral opinion, the court expressed that it

---

[16] In *Taylor*, 306 Md. at 311, the Court explained that the factors it expressly discussed are "not intended to be all-inclusive, and a trial judge should consider all other circumstances that reasonably relate to the issue."

had "considered a variety of options, none of which is especially satisfactory." At the end of the three-day hearing, for example, the Circuit Court had observed: "each parent seems to have the view that if they respectively, one or the other, has sole legal custody the problems will stop and they will have control. The reality is that will never happen."

The court also acknowledged that the existing joint custody arrangement had proved problematic. But the court expressed that the parents had good relationships with their children, loved and could provide for them. Thus, the court reasoned that "the children will do best if they see each parent regularly" and that "the children need to see each of you and have a close relationship with both [of] you." The court's discussion reveals that, in maintaining joint legal custody, it was focused on what was in the children's best interests.

The court candidly and repeatedly acknowledged that the parents were unable to communicate or cooperate well, but was concerned about the children's need to stay involved with both parents. It determined that "the only way both of these parents can stay involved with their children's lives is with [a] strict set of rules about who does what and when." Such rules included provisions granting tie-breaking authority on education, religion, and medical issues to Father, and selection of therapist to Mother. As we have explained *supra*, courts have employed tie-breaking provisions in joint custody awards on account of poor parental communication. *See, e.g.*, *Bonner*, 170 So. 3d at 703 ("The trial court's judgment [awarding joint custody], however, resolved those types of conflicts by designating the husband as the primary decision maker regarding the child's education."); *Rembert*, 674 S.E.2d at 894 ("Thus, it is unlikely that they will agree on these issues; the

22

need to designate a final decision-maker is apparent; and the trial court did not abuse its discretion in selecting the primary custodial parent as that decision-maker [in its joint custody award]."); *Glidewell*, 869 N.W.2d at 808 (affirming joint custody with division of decision-making duties where "the anger that [the parents] ha[d] towards one another cloud[ed] their judgment and prevent[ed] them from making important collective decisions on behalf of their children").

Moreover, testimony at the hearing, including the excerpts below, provided a basis for the Circuit Court to award one parent decision-making authority over the other as it did:

- **Education (Father)**: The children's school principal testified she would reconsider allowing them to attend "if [Father] was in charge, then it would definitely be. So, if he had sole custody it would be dealing with one person who had the children's best interests and could work cooperatively with the school."

- **Religion (Father)**: A member of the temple where the children attend religious school testified that she nominated Father to be a board member: "[Father] was an involved parent at the religious school. And I thought he would be [*sic*] a good perspective to the Board of Education."

- **Medical issues (Father)**: One of the children's psychiatrist, who administered his medications, testified on cross-examination about email communication with the parents: "So, with the email that was sent, the impression that I got unfortunately, was that she [Mother] no longer wanted to communicate with me. And so I have to use the resources that I have to make the best decisions that I can for a child."

- **Selection of therapist (Mother)**: Mother testified: "I am a psychiatric therapist. I am in private practice, and have a number of ongoing consulting cases."

23

The Circuit Court's order also included solutions to the relevant problems the court identified at the hearing:

- **Medication**: "Mother will be provided the medication necessary for each child while the child or children are with her. Father shall assure that [M]other has the name and dosage for each such medication."[17]

- **Therapy**: "The children will remain in regular therapy. The parents will see that the children go on a regular, consistent basis and that the therapy takes precedence over other activities."[18]

- **Extracurricular activities**: "Each parent will decide the activities in which the children will participate when the children are [with] that parent and will pay for those activities individually."[19]

- **Threats**: "Mother will not threaten school, religious, or medical personnel."[20]

- **Derogatory remarks**: "Father will not speak or act in a derogatory manner toward [M]other or denigrate her in public."[21]

---

[17] The court concluded: "Father. Is dictatorial and finds ways to make everything a final legal custody decision."

[18] The court concluded: "These children will need therapeutic intervention because they are living in a war zone."

[19] The court concluded: "Mother refuses to allow the children to participate in activities on, quote, her parenting time, close quote, ignoring the children's right to a life unencumbered by parental bickering."

[20] The court concluded: "[Mother] has risked the school placement."

[21] The court concluded: "[Father] has humiliated [M]other in public . . . ."

24

Father pins the basis for the court's decision to award joint custody on its statement that "the reason for [the parties to continue to have joint legal custody] is so that both of them have access to information about the children." In Father's view, this reason is insufficient because Maryland law already entitles parents to records about their children. That is, FL § 9-104 states that "access to medical, dental and educational records concerning the child may not be denied to a parent because the parent does not have physical custody of the child." FL § 9-104.

The Circuit Court's statement is better understood, in context, as reflecting its concern that Father was "dictatorial," and that his actions deprived Mother of information about her children, information that goes beyond the scope of FL § 9-104, which simply entitles parents to *records*. *See* FL § 9-104. Mother gave the following testimony about Father's actions:

- "However, over the course, especially of the last year, [Father] has treated me and third parties as if he had full custody and actively excluded me from decision making and information pertaining to the lives of the children."

- "Without any discussion with me, he and Dr. Wu pulled medication and decided that [our son's] [medication] needs to be provided by the school."

- "[Father] will do things like send me e-mails saying that he took [our son] to an emergency medical appointment, that [our son] was diagnosed with swimmer's ear. Will not tell me what the medication is, which ear it is, when I'm supposed to give the medication. I have to ask every specific question in detail in order to get any information."

- "[Father] informed me of [our son's sprained wrist], after it happened, but failed to give me pertinent details."

- Mother explains she cannot get information at an urgent care center because the center did not know she was a custodial parent.

- "[Father] regularly has the children in locations that I don't know about being taken care of by his parents, or by [his new wife's] parents, and I don't know where they are or when they're going."

- "[T]here was this series of 7 or 8 instances during that time period where I was not given information where the children were injured on school property and I was not called."

Ultimately, Father's argument about FL § 9-104 overlooks the evidence of Mother's exclusion and the court's view of Father's "dictatorial" conduct. The court evidently believed that it was in the children's best interests to "have a close relationship" with Mother—as well as with Father. For Mother to have an effective relationship, though, she would need access to information about her children; granting Father sole legal custody would undermine that objective.

The Circuit Court's determination—predicated on its thorough review of the *Taylor* factors, deliberation over custody award options, sober appreciation of the difficulties before it, and use of strict rules including tie-breaking provisions to account for the parties' inability to communicate—was rational and guided by established principles of Maryland law. No abuse of discretion occurred in this case.

### CONCLUSION

We hold today that a court of equity ruling on a custody dispute may, under appropriate circumstances and with careful consideration articulated on the record, grant joint legal custody to parents who cannot effectively communicate together regarding

26

matters pertaining to their children. In doing so, the court has the legal authority to include tie-breaking provisions in the joint legal custody award. In this case, the Circuit Court's order of joint legal custody with tie-breaking provisions was not an abuse of discretion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

27

Circuit Court for Montgomery County
Case No. 87541

Argued: May 5, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 89

September Term, 2015

_____

ADAM SANTO

v.

GRACE SANTO

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Battaglia, Lynne A. (Retired,
Specially Assigned),

JJ.

_____

Concurring Opinion by Watts, J., which
Battaglia, J., joins

_____

Filed: July 11, 2016

Respectfully, I concur and write separately to elaborate on the majority opinion in one respect only.

I agree with the Majority that the holding in Taylor v. Taylor, 306 Md. 290, 508 A.2d 964 (1986) does not act as a bar to joint custody where the parties are unable to effectively communicate. See Maj. Slip Op. at 8, 25-26. In Taylor, this Court expressly acknowledged that in unusual cases joint custody may be appropriate despite parents' inability to effectively communicate with each other. In Taylor, id. at 307, 508 A.2d at 972, we explained:

> **In the unusual case** where the trial [court] concludes that joint legal custody is appropriate notwithstanding the absence of a "track record" of willingness and ability on the part of the parents to cooperate in making decisions dealing with the child's welfare, the trial [court] must articulate fully the reasons that support that conclusion.

(Emphasis added). As Taylor permits, here, the Circuit Court for Montgomery County ordered joint legal custody, notwithstanding evidence of the parties' inability to effectively communicate with each other. Stated otherwise, the evidence established that this was the unusual case that warranted such a result, and the trial court fully articulated the reasons supporting that conclusion.

Taylor has served the State well for thirty years, and establishes that an order of joint legal custody despite parents' inability to communicate should be "the unusual case[,]" not the norm. Id. at 307, 508 A.2d at 972. The rationale for joint legal custody being the unusual case where parents are unable to communicate seems obvious; children should not be placed in a contentious environment, between embattled parents, unless there is no other alternative that achieves the goal of serving their best interests. The Majority

did not alter <u>Taylor</u> to reach the correct result in this case. I fear, however, that in endorsing a trial court's ability to order joint legal custody where the evidence establishes that the parties are unable to communicate effectively and make joint decisions, the Majority did not include the caveat explicitly set forth in <u>Taylor</u> that such a result is to be the unusual or infrequent case. Given that the majority opinion does not purport to alter or abridge <u>Taylor</u> in any manner, <u>Taylor</u> in its entirety—including the observation that an award of joint legal custody despite the ability of the parents to effectively communicate is the unusual case— remains good law. From my perspective, this is an important point that should not be overlooked.

For the above reasons, respectfully, I concur.

Judge Battaglia has authorized me to state that she joins in this opinion.